USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-2063 RICHARD MAX STRAHAN, Plaintiff - Appellee, v. TRUDY COXE, SECRETARY OF MASSACHUSETTS EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS, ET AL., Defendants - Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _____________________ Salvatore M. Giorlandino, Assistant Attorney General, with ________________________ whom Scott Harshbarger, Attorney General of Massachusetts, and _________________ Douglas H. Wilkins, Assistant Attorney General, Chief, Government __________________ Bureau, were on brief for appellant Commonwealth of Massachusetts. Alan Wilson for Conservation Law Foundation, Inc., amicus ___________ curiae. Richard Max Strahan pro se. ___________________ ____________________ October 9, 1997 ____________________ -2- TORRUELLA, Chief Judge. In April 1995, Richard Strahan TORRUELLA, Chief Judge. ___________ ("Strahan") filed suit against Trudy Coxe, Secretary of the Massachusetts Executive Office of Environmental Affairs, John Phillips, Commissioner of the Massachusetts Department of Fisheries, Wildlife, and Environmental Law Enforcement, and Philip Coates, Director of the Massachusetts Division of Marine Fisheries (together "defendants"), claiming that these Massachusetts state officers were violating the federal Endangered Species Act ("ESA"), 16 U.S.C. 1531 et seq., and the _______ Marine Mammals Protection Act ("MMPA"), 16 U.S.C. 1361 et seq. ______ Strahan sought a preliminary injunction ordering the Commonwealth to revoke licenses and permits it had issued authorizing gillnet and lobster pot fishing and barring the Commonwealth from issuing such licenses and permits in the future unless it received "incidental take" and "small take" permits from the National Marine Fisheries Service ("NMFS") under the ESA and MMPA. Defendants moved to dismiss Strahan's complaint and, in the alternative, for summary judgment. On September 24, 1996, the district court: (1) denied defendants' motion for summary judgment on Strahan's ESA claims; (2) dismissed Strahan's MMPA claims; and (3) granted summary judgment on Strahan's ESA claims in Count IV of Strahan's amended complaint. Strahan v. Coxe, 939 F. Supp. 963 (D. Mass. 1996). _______ ____ In this ruling, the district court declined to grant the preliminary injunctive measures sought by Strahan. Instead, the court issued a preliminary injunction ordering defendants to: (1) -3- "apply for an incidental take permit [under the ESA] from NMFS . . . for Northern Right whales"; (2) "apply for a permit under the [MMPA] for Northern Right whales"; (3) "develop and prepare a proposal . . . to restrict, modify or eliminate the use of fixed- fishing gear in coastal waters of Massachusetts listed as critical habitat for Northern Right whales in order to minimize the likelihood additional whales will actually be harmed by such gear"; and (4) "convene an Endangered Whale Working Group and to engage in substantive discussions with the Plaintiff [Strahan], or his representative, as well as with other interested parties, regarding modifications of fixed-fishing gear and other measures to minimize harm to the Northern Right whales." Id. at 990-91. ___ Defendants appeal the district court's preliminary injunction order. Plaintiff Strahan cross-appeals the district court's: (1) refusal to grant him the precise injunctive relief sought; (2) dismissal of his MMPA claims; (3) alleged limitation on his right to discovery; and (4) alleged error in a factual ruling. For the reasons stated herein, we vacate paragraph two of the injunction, requiring defendants to apply for a permit under the MMPA, and otherwise affirm the district court's opinion and order of injunctive relief. BACKGROUND BACKGROUND I. Status of the Northern Right whale I. Status of the Northern Right whale Strahan is an officer of GreenWorld, Inc., an organization dedicated to the preservation and recovery of endangered species. Strahan, 939 F. Supp. at 966 & n.6. Strahan _______ -4- brought suit on behalf of the Northern Right whale, listed as an endangered species by the federal government. See 50 C.F.R. ___ 222.23(a). Northern Right whales are the most endangered of the large whales, Strahan, 939 F. Supp. at 968, presently _______ numbering around 300, 62 Fed. Reg. 39157, 39158 (1997). Entanglement with commercial fishing gear has been recognized as a major source of human-caused injury or death to the Northern Right whale. Final Recovery Plan for the Northern Right Whale __________________________________________________ (Eubalaena Glacialis), NMFS (December 1991)("Right Whale Recovery _____________________ Plan") at 24; see also Strahan, 939 F. Supp. at 972. Collision ________ _______ with ships is also a significant cause of Northern Right whale death. See Right Whale Recovery Plan at 10; Strahan, 939 F. ___ _______ Supp. at 972. The majority of Northern Right whales are present in Massachusetts waters only during spring feeding. Strahan, 939 F. _______ Supp. at 968. The district court found, based on statements made by defendants as well as on affidavits from three scientists, that Northern Right whales have been entangled in fixed fishing gear in Massachusetts coastal waters at least nine times. See ___ Strahan, 939 F. Supp. at 984 ("On May 15, 1983, a Right whale was _______ observed 'thrashing around' a location three miles east of Manomet Point in Plymouth, MA because of its entanglement in ropes attached to lobster buoys. . . . Right whales were also found entangled in lobster and other fishing gear in Massachusetts waters on June 16, 1978, May 13, 1982, October 14, 1985, May 15, 1983, August 29, 1986, August 7, 1993, November 17, -5- 1994, and August 17, 1995. At least one of these whales was not expected to survive its injuries from the gear."). Moreover, a Northern Right whale mortality was reported off Cape Cod, Massachusetts in May 1996. 61 Fed. Reg. 41116, 41117 (Aug. 7, 1996). The NMFS issued a final interim rule proposing to close off entirely the critical habitat of the Northern Right whale and to modify fishing practices to enhance the viability of the Northern Right whale. Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations, 62 Fed. Reg. 39157, 39158-39159 (July 22, 1997). The report accompanying the proposed rule recognized that entanglement with fishing gear is one of the leading causes of the depletion of the Northern Right whale population and indicated that more than half of the Northern Right whale population bear scars indicating unobserved and unrecorded earlier entanglement. Id. The report calls for a ban on gillnet ___ fishing and lobster pot fishing, the two manners of fishing at issue in this case, during the Northern Right whales' high season in the Cape Cod Bay Critical Habitat from January 1 to May 15 of each year, and in the Great South Channel from April 1 to June 30, until modified fishing equipment is developed that will diminish the risk of injury and death to the Northern Right whale. Id. at 39159-39160. ___ II. Massachusetts' regulatory authority scheme II. Massachusetts' regulatory authority scheme -6- The Massachusetts Division of Marine Fisheries ("DMF") is vested with broad authority to regulate fishing in Massachusetts's coastal waters, Mass. Gen. L. c. 130, which extend three nautical miles from the shoreline, see Strahan, 939 ___ _______ F. Supp. at 974. Nearly all commercial fishing vessels must receive a permit from DMF in order to take fish, including shellfish, from Massachusetts coastal waters. 322 C.M.R.  7.01-7.05, 8.08. DMF is a division of the Department of Fisheries, Wildlife and Environmental Law Enforcement, which is part of the Executive Office of Environmental Affairs. Id.; ___ Mass. Gen. L. c 21A, 2, 7, 8. The Division of Fisheries and Wildlife, a subcomponent of the Department of Fisheries, Wildlife and Environmental Law Enforcement, "has authority over all endangered species of Massachusetts including marine mammals." Id. (quoting Coates Aff. 3). ___ The DMF has limited the use of gillnets and lobster pot fishing gear in certain areas. See id. at 947-75; see also 322 ___ ___ ________ C.M.R. 4.09 (restricting use of gillnets south and west of Cape Cod), 4.11 (restricting use of gillnets in Massachusetts Bay), 4.13 (regulating fixed gear marking and maximum length requirements), 6.13 (setting lobster trap limit), 8.10 (fixed gear restrictions). "In 1994, in response to the alarming depletion of the Harbor porpoise, DMF ordered that all sink gillnets be removed from coastal waters north of Cape Ann every November and from Massachusetts Bay and Cape Cod Bay every -7- March." 939 F. Supp. at 975 (citing DMF Rules Update (Nov. 2, 1994)). In addition, the DMF has established a 500-yard "buffer zone" around Northern Right whales in Massachusetts coastal waters. 322 C.M.R. 12.00-12.05 (1993). Defendant Coates admitted that he had "issued a limited number of scientific research permits to some whale watch vessels exempting them from the 500 yard buffer zone surrounding right whales for scientific research purposes upon application." Coates Aff. 11. STANDARD OF REVIEW STANDARD OF REVIEW In ruling on a motion for preliminary injunction, a district court is charged with considering: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 _____________________________ ______________ (1st Cir. 1996). Under the ESA, however, the balancing and public interest prongs have been answered by Congress' determination that the "balance of hardships and the public interest tips heavily in favor of protected species." National ________ Wildlife Fed'n v. Burlington Northern R.R., 23 F.3d 1508, 1510 ______________ _________________________ (9th Cir. 1994). Our review of the district court's ruling on a motion for preliminary injunction is deferential and, "unless the appellant can show that the lower court misapprehended the law or -8- committed a palpable abuse of discretion, the court of appeals will not intervene." Ross-Simons of Warwick, Inc., 102 F.3d at ____________________________ 16. DISCUSSION DISCUSSION I. Marine Mammal Protection Act I. Marine Mammal Protection Act Strahan contends on cross-appeal that the district court erred when it determined that he could not bring a citizen suit under the provisions of the Marine Mammal Protection Act. See 939 F. Supp. at 975. Defendants, on the other hand, argue ___ that the district court, having properly found that it lacked jurisdiction under the MMPA, erroneously entered a remedy under the MMPA when it ordered the Commonwealth, in paragraph 2 of the preliminary injunction order, to apply for an incidental take permit pursuant to section 1387 of the MMPA and, in paragraph 4, to convene a working group similar to those initiated pursuant to the MMPA. See id. at 990-91. We find that the district court ___ ___ properly held that it lacked jurisdiction under the MMPA, and therefore its remedy in paragraph 2 based on the MMPA was erroneous. We find, however, that the remedy in paragraph 4 was not ordered pursuant to the MMPA, but instead was intended to be modelled on MMPA working groups and, therefore, was not erroneous. The MMPA does not authorize citizen suits against a person alleged to be in violation of the Act. The Act states that, "[e]xcept as otherwise provided in this subchapter, the Secretary shall enforce the provisions of this subchapter." 16 -9- U.S.C. 1377. The district court properly recognized that the Act does not authorize the federal courts to enforce its provisions in the type of suit brought by Strahan. See 939 F. ___ Supp. at 975. In addition, the court properly found that the Administrative Procedure Act, 5 U.S.C. 701 et seq., does not _______ authorize suits against state officials. See 939 F. Supp. at ___ 975. Based on these findings, the court correctly concluded that it did not have jurisdiction under the MMPA. Seeking a contrary ruling, Strahan relies solely on Kokechik Fisherman's Association v. Secretary of Commerce, 839 _________________________________ ______________________ F.2d 795, 802 (D.C. Cir. 1988). In that case, the court affirmed a district court ruling that an incidental take permit issued by the Secretary of Commerce was contrary to the requirements of the MMPA. Id. The federal court had jurisdiction to hear the claims ___ presented in Kokechik by virtue of 16 U.S.C. 1374(d)(6), which ________ authorizes judicial review of the terms and conditions of a permit issued by the Secretary. See Kokechik, 839 F.2d at 797. ___ ________ Thus, the case stands for the uncontroversial proposition that a citizen can seek review of the Secretary's actions under the MMPA, and does not provide authority to support Strahan's position that a private citizen can seek an injunction against a state official under the MMPA. Defendants' argument respecting the remedy ordered in paragraph 2 has merit. Defendants argue that if the district court has no jurisdiction under the MMPA, it logically follows that the district court may not order a remedy that requires -10- compliance with provisions of the MMPA. In paragraph 2, the district court ordered the Commonwealth officials to comply with the terms of the MMPA by applying for an incidental take permit pursuant to 16 U.S.C. 1387. Except with respect to review of permits actually granted, Congress vested enforcement of the provisions of the MMPA in the Secretary of Commerce, not in the federal courts. See 16 U.S.C. 1377. Consequently, the ___ district court lacked the jurisdiction to order that the defendants comply with the MMPA. We therefore vacate paragraph 2 of the district court's preliminary injunction order. We have considered the argument of the Conservation Law Foundation that the cross-reference provision, cited by the district court, effectively makes the substantive provisions of the MMPA part of the ESA for purposes of enforcement through a citizen's suit. Although the argument is not frivolous, on balance we think that the provision does not incorporate one statute into the other. It merely prevents anyone from arguing that the less restrictive requirements of one statute supersede the more restrictive requirements of the other. On the other hand, the substantive provisions of the Marine Mammal Protection Act appear to be triggered by the same activities that the district court, at least for preliminary injunction purposes, found to be a taking. To the extent that the defendants may fail to meet the arguably more stringent standards of the MMPA, the Secretary of Commerce might conclude that it was improper to issue a permit under the ESA for -11- activities that were unlawful under another statute also administered by the Secretary. It is premature for this Court to decide how the matter should be resolved if the Secretary took a different view and issued an ESA permit while ignoring a violation of the MMPA. Finally, defendants contend that the district court lacked jurisdiction under the MMPA to order the defendants to form a working group modeled on working groups required pursuant to the MMPA. The district court's order was as follows: Fourth, the Defendants will be ordered to convene an Endangered Whale Working Group and to engage in substantive discussions with the Plaintiff, or his representative, as well as with other interested parties, regarding modifications of fixed-fishing gear and other measures to minimize harm to the Northern Right whales. 939 F. Supp. at 991. We understand the district court here to be ordering, under its equitable powers, a working group that is merely modelled on MMPA working groups dedicated to the preservation of other marine mammals. Nothing suggests that this portion of the district court's order was issued pursuant to any authority other than its equitable powers. That is, we do not read this order as emanating from the provisions of the MMPA itself, but rather from the court's inherent powers to fashion appropriate equitable relief. See discussion of equitable ___ powers, infra at 34. Thus, we find no abuse in this exercise of _____ discretion and we do not find any error. II. Endangered Species Act II. Endangered Species Act -12- A. Statutory and regulatory background A. Statutory and regulatory background The Endangered Species Act was enacted with the purpose of conserving endangered and threatened species and the ecosystems on which they depend. See 16 U.S.C. 1531. The ESA ___ is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." TVA v. Hill, 437 ___ ____ U.S. 153, 180 (1978). The Act empowers the Secretary of Commerce to recommend to the Secretary of the Interior that a species be listed as endangered or threatened and that the species' habitat be listed as a critical habitat. See 1533(a)(2)(A). The ___ Secretary of the Interior, if he concurs, shall implement the designation. See 1533(a)(3)(A). The Act further requires the ___ Secretary to develop and implement plans for the conservation and survival of an endangered or threatened species. See 1533(f). ___ The Northern Right whale has been listed as endangered pursuant to the ESA. See 50 C.F.R. 222.23(a).  ___ As it relates to this litigation, the ESA prohibits any person from "tak[ing] any [endangered] species within the United States or the territorial sea of the United States." 1538(a)(1)(B). In addition, the ESA makes it unlawful for any person "to attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the ESA. See 1538(g). ___ The term "'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 1532(19). "'Take' is defined . . . in the broadest possible manner to include every conceivable way in -13- which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93-307, at 7 (1973); see also Babbitt v. ________ _______ Sweet Home Chapter of Communities for a Great Oregon, __ U.S. __, ____________________________________________________ 115 S. Ct. 2407, 2416 (1995) (citing Senate and House Reports indicating that "take" is to be defined broadly). The Secretary of the Interior has defined "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." See 50 ___ C.F.R. 17.3 (1994); Sweet Home, 115 S. Ct. at 2412-14 ___________ (upholding the regulation as a reasonable interpretation of the statutory language). The term "person" includes "any officer, employee, agent, department, or instrumentality . . . of any State, municipality, or political subdivision of a State . . . [or] any State, municipality, or political subdivision of a State . . . ." 16 U.S.C. 1532(13). Under the ESA regulatory scheme, the National Marine Fisheries Service ("NMFS"), part of the National Oceanic and Atmospheric Administration ("NOAA") within the Department of Commerce, is responsible for species of the order Cetacea (whales and dolphins) under the ESA and the MMPA. See ESA, 16 U.S.C. ___ 1532(15), 1540; MMPA, 16 U.S.C. 1362(12), 1377; Incidental Take of Endangered, Threatened and Other Depleted Marine Mammals, 54 Fed. Reg. 40,338 (1989). Under the ESA, the Secretary of Commerce, acting through the NMFS, may permit the taking of an -14- endangered species if that taking is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 1539(a)(1)(B). Pursuant to an application for an incidental take permit, an applicant must submit a conservation plan discussing the impact of the incidental takings, the steps the applicant will take to minimize the impact, and the alternatives considered with reasons why the alternatives would not be implemented. See 1539(2)(A). ___ On August 31, 1995, the NMFS implemented a prohibition on any taking of a Northern Right whale incidental to commercial fishing operations. See Taking of Threatened or Endangered ___ Marine Mammals Incidental to Commercial Fishing Operations; Interim Permit, 60 Fed. Reg. 45,399 (NMFS) (Aug. 31, 1995). In addition, the NMFS recently implemented a ban on approaches within 500 yards of a Northern Right whale. See North Atlantic ___ Northern Right Whale Protection; Interim Final Rule, 62 Fed. Reg. 21562 (Apr. 25, 1997). This restriction brings the federal approach distance in line with the Massachusetts 500 yard approach prohibition. See 322 Code Mass. Reg. 12.05. ___ Furthermore, the NMFS has proposed an interim final rule, modifying 50 C.F.R. pt. 229 and set to become effective November 15, 1997, 62 Fed. Reg. 39157 (July 22, 1997), that restricts the use of gillnet and lobster pot fishing gear during specific times of the year unless the gear conforms to marking and design requirements set forth within the provision. See 62 ___ Fed. Reg. at 39184. The regulation restricts lobster pot -15- fishing, unless in compliance with gear modification requirements, in the Cape Code Bay Restricted Area from January 1 to May 15 of each year. Id. at 39185. During the remainder of ___ the year, lobster pot gear must comply with at least two of the gear modification restrictions. Id. at 39186. The Great South ___ Channel Restricted Lobster Area is similarly restricted from April 1 to June 30 of each year. Again, during the remainder of the year, lobster pot gear must comply with at least two of the gear modification restrictions. Id. With respect to gillnet ___ fishing, such fishing is prohibited from January 1 through May 15 of each year unless the gear complies with modifications that may be required by regulations promulgated by the Assistant Administrator. Id. at 39187. During the remainder of the year, ___ no person may engage in gillnet fishing unless the gear complies with at least two modifications listed in the Gillnet Take Reduction Technology List in paragraph (d)(9) of the section. Id. The same restrictions apply to the Great South Channel ___ restricted gillnet area, with a spring closure period from April 1 to June 30 of each year and a restricted period for the duration of the year. Id. In all other northeast waters, ___ restricted fishing, with modified gillnet or lobster pot gear similar to that allowed in the Cape Cod and Great South Channel areas, is allowed. Id. at 39186-39187. These proposed ___ restrictions, however, do not impact on the district court's and this court's consideration of whether Massachusetts, through its fishing licensure scheme, has violated the provisions of the ESA. -16- B. Legal challenges B. Legal challenges The district court's reasoning, in finding that Massachusetts' commercial fishing regulatory scheme likely exacted a taking in violation of the ESA, was founded on two provisions of the ESA read in conjunction. The first relates to the definition of the prohibited activity of a "taking," see  ___ 1538(a)(1)(B), and the second relates to the solicitation or causation by a third party of a prohibited activity, such as a taking, see 1538(g). The district court viewed these ___ provisions, when read together, to apply to acts by third parties that allow or authorize acts that exact a taking and that, but for the permitting process, could not take place. Indeed, the district court cited several opinions that have also so held. See, e.g., Sierra Club v. Yeutter, 926 F.2d 429, 438-39 (5th Cir. ___ ____ ___________ _______ 1991) (finding Forest Service's management of timber stands was a taking of the red-cockaded woodpecker in violation of the ESA); Defenders of Wildlife v. EPA, 882 F.2d 1294, 1301 (8th Cir. 1989) _____________________ ___ (holding that the EPA's registration of pesticides containing strychnine violated the ESA, both because endangered species had died from ingesting strychnine bait and because that strychnine could only be distributed pursuant to the EPA's registration scheme); Palila v. Hawaii Dep't of Land and Nat. Res., 639 F.2d ______ ___________________________________ 495, 497-98 (9th Cir. 1981) (holding state's practice of maintaining feral goats and sheep in palila's habitat constituted a taking and ordering state to remove goats and sheep); Loggerhead Turtle v. County Council of Volusia County, 896 F. _________________ __________________________________ -17- Supp. 1170, 1180-81 (M.D. Fla. 1995) (holding that county's authorization of vehicular beach access during turtle mating season exacted a taking of the turtles in violation of the ESA). The statute not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking. We believe that, contrary to the defendants' argument on appeal, the district court properly found that a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA. The defendants argue that the statute was not intended to prohibit state licensure activity because such activity cannot be a "proximate cause" of the taking. The defendants direct our attention to long-standing principles of common law tort in arguing that the district court improperly found that its regulatory scheme "indirectly causes" these takings. Specifically, the defendants contend that to construe the proper meaning of "cause" under the ESA, this court should look to common law principles of causation and further contend that proximate cause is lacking here. The defendants are correct that when interpreting a term in a statute which is, like "cause" here, well-known to the common law, the court is to presume that Congress intended the meaning to be interpreted as in the common law. See Veiga v. McGee, 26 F.3d 1206, 1210 (1st Cir. 1994). We ___ _____ _____ do not believe, however, that an interpretation of "cause" that -18- includes the "indirect causation" of a taking by the Commonwealth through its licensing scheme falls without the normal boundaries. The defendants protest this interpretation. Their first argument is that the Commonwealth's licensure of a generally permitted activity does not cause the taking any more than its licensure of automobiles and drivers solicits or causes federal crimes, even though automobiles it licenses are surely used to violate federal drug laws, rob federally insured banks, or cross state lines for the purpose of violating state and federal laws. The answer to this argument is that, whereas it is possible for a person licensed by Massachusetts to use a car in a manner that does not risk the violations of federal law suggested by the defendants, it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in the manner permitted by the Commonwealth without risk of violating the ESA by exacting a taking. Thus, the state's licensure of gillnet and lobster pot fishing does not involve the intervening independent actor that is a necessary component of the other licensure schemes which it argues are comparable. Where the state has licensed an automobile driver to use that automobile and her license in a manner consistent with both state and federal law, the violation of federal is caused only by the actor's conscious and independent decision to disregard or go beyond the licensed purposes of her automobile use and instead to violate federal, and possibly state, law. The situation is -19- simply not the same here. In this instance, the state has licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in a violation of federal law. The causation here, while indirect, is not so removed that it extends outside the realm of causation as it is understood in the common law.1 The defendants' next argument need only detain us momentarily. They contend that the statutory structure of the ESA does not envision utilizing the regulatory structures of the states in order to implement its provisions, but that it instead leaves that implementing authority to NMFS. The point that the defendants miss is that the district court's ruling does not impose positive obligations on the Commonwealth by converting its regulation of commercial fishing operations into a tool of the federal ESA regulatory scheme. The Commonwealth is not being compelled to enforce the provisions of the ESA. Instead, the district court's ruling seeks to end the Commonwealth's continuing violation of the Act.2  ____________________ 1 The defendants' citation to cases in which courts refused to impose liability for a state's exercise of its regulatory activity is misplaced. In Haddock v. Board of Dental Examiners _______ __________________________ of California, 777 F.2d 462, 463 (9th Cir. 1985), for example, _____________ the relevant statute applied only to "employers," "employment agencies," and "labor organizations," and the state's Board of Dental Examiners clearly did not fall within the definition of those terms. Under the ESA's definition of a "person" who is prohibited from exacting a taking, the Commonwealth just as clearly falls within the definition. 2 We note that the defendants' concerns about the authority of the district court to force the Commonwealth to ban gillnet and lobster pot fishing where the federal administering agency, NMFS, has chosen not to do so are misplaced. Had the district court -20- Defendants also contend that the district court's ruling is erroneous because it fails to give deference to the position of NMFS, the federal agency charged with enforcing the ESA. The defendants' position is flawed for two reasons. First, the ESA gives NMFS, through the Secretary, discretion in authorizing takings incidental to certain commercial activity; the Act does not give a federal court, having determined that a taking has occurred, the same discretion in determining whether to grant injunctive relief. Second, the fact that NMFS has expressly declined to ban gillnet or lobster pot fishing in Cape Cod Bay does not reflect a policy determination by NMFS that such a ban is unnecessary. For these two reasons, we find the defendants' deference arguments without merit. C. Factual challenges C. Factual challenges We review the district court's findings of fact for clear error. See Concordia Co. v. Panek, 115 F.3d 67, 69 (1st ___ _____________ _____ Cir. 1997). The district court found that entanglement with fishing gear in Massachusetts waters caused injury or death to Northern Right whales. See 939 F. Supp. at 984. Indeed, the ___ district court cited several of the Commonwealth's documents in support of this finding, including its statement that "'[f]ive right whales have been found entangled in fixed fishing gear in Massachusetts waters; three in gillnets and two in lobster  ____________________ actually ordered such a ban, we might consider these concerns, but indeed the district court has not required the Commonwealth in its injunction to impose such a ban. The situation complained of by the defendants is simply not before us. -21- lines.'" Id. (quoting Right Whales in Massachusetts Waters, An ___ Executive Summary at 2). The court further cited to affidavits of three scientists that suggested that entanglement of Northern Right whales had harmed, injured, or killed those whales. The court cited eleven occasions on which Northern Right whales had been found entangled in fishing gear in Massachusetts waters between 1978 and 1995. The court also indicated that at least fifty-seven percent of all Northern right whales have scars indicating prior entanglement with fishing gear and noted that, even where the whale survives, the entanglement still wounds the whale. Although these findings indicate only that entanglements have occurred in Massachusetts waters, the district court determined that three whales had been found entangled in gear deployed in Massachusetts waters. The defendants contend that the factual evidence before the district court did not support a finding that the Commonwealth has perpetrated a taking. The defendants' main contention is that the "District Court made its 'taking' determination . . . based on speculation that Northern Right whales have become entangled in fishing gear: (1) deployed in Massachusetts coastal waters; and (2) licensed by the Commonwealth." Appellants' Br. at 42. The defendants first state that they submitted affidavit evidence indicating that no deaths of Northern Right whales had occurred in Massachusetts coastal waters. While this may be true, it answers only half the taking question, which bars not only killings of, but also -22- injuries to, Northern Right whales. Because the district court need not have made a determination as to whale deaths in determining whether the Commonwealth exacted a taking, we find no error. The defendants acknowledge that the district court relied on a scientist's affidavit that was supplied by amicus curiae Conservation Law Foundation. The defendants do not challenge the factual statements asserted in the affidavit, including the one relied upon by the district court that "[t]hree of the entanglements of endangered whales . . . clearly involved fishing gear that was deployed in Massachusetts waters." Despite the defendants' protests that the district court was engaging in speculation when it found that whales have become entangled in fishing gear deployed in Commonwealth's waters, in fact the district court relied on the unchallenged factual assertion in the scientific affidavit. Thus, the defendants' first challenge to the district court's fact-finding speculation is not valid. With respect to the district court's determination that these entanglements involved gear licensed by the Commonwealth, the district court relied on the affidavit regarding the three entanglements that occurred in Massachusetts waters. The affidavit explained that the whales were found entangled in gear "fixed" in Massachusetts waters such that the whale could not escape because it could not break free of the gear. The district court's inference that gear fixed in Massachusetts waters was licensed by the Commonwealth, and was not set illegally or -23- brought into Massachusetts waters from another area by the whale, was reasonable and we find no clear error in that inference. The defendants next contend that the district court ignored evidence of the significant efforts made by the Commonwealth to "minimize Northern Right Whale entanglements in fishing gear," and evidence of other causes of takings of Northern Right whales. With respect to the determination of whether a taking has occurred, the district court quite rightly disregarded such evidence. Given that there was evidence that any entanglement with fishing gear injures a Northern Right whale and given that a single injury to one whale is a taking under the ESA, efforts to minimize such entanglements are irrelevant. For the same reasons, the existence of other means by which takings of Northern Right whales occur is irrelevant to the determination of whether the Commonwealth has engaged in a taking. Finding neither any error of law nor any clear error with respect to the factual findings, we believe that the district court properly applied the ESA to the facts presented and was correct in enjoining the Commonwealth so as to prevent the taking of Northern Right whales in violation of the ESA. III. Scope of injunctive relief III. Scope of injunctive relief Defendants claim that the injunctive relief granted by the district court goes beyond the scope of remedies available in an action against state officials. Specifically, defendants claim that, although the district court could have ordered an injunction barring all Commonwealth licensing activity, it could -24- not require the Commonwealth to implement measures designed to accord Northern Right whales greater regulatory protection. Defendants argue that the statutory scheme, the Eleventh Amendment, and the Tenth Amendment all bar the measures ordered by the district court. A. Statutory scheme/Eleventh Amendment A. Statutory scheme/Eleventh Amendment The ESA's citizen suit provisions authorize any person [to] commence a civil suit on his own behalf-- (a) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof . . . . 16 U.S.C. 1540(g)(1). The very fact that Congress has limited its authorization to suits allowed by the Eleventh Amendment reinforces the conclusion that Congress clearly envisioned that a citizen could seek an injunction against a state's violations of the ESA. Defendants' claim that the district court exceeded its authority to order injunctive relief against the Commonwealth under the ESA statutory scheme is ultimately grounded in the limitations provided under the Eleventh Amendment. The Eleventh Amendment provides: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by the Citizens of another State, or by Citizens or Subjects of any Foreign State. -25- U.S. Const. amend. XI. "The Amendment . . . enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction." Idaho v. Coeur _____ _____ d'Alene Tribe of Idaho, __ S. Ct. __, 1997 WL 338603, at * 5 _______________________ (June 23, 1997). This Amendment has been interpreted to provide sovereign immunity not only to suits by citizens of another state, but also to suits by the state's citizens. Id. Suits ___ invoking both diversity and federal-question jurisdiction of Article III may be barred by the Amendment. Id. ___ Nevertheless, familiar exceptions to the sovereign immunity bar exist. A suit may be brought by a citizen against a state in two manners. The first occurs when a state waives its sovereign immunity and allows a case to be brought against it in federal court. Id. The other allows suits against state ___ officials seeking declaratory and injunctive relief against the state officials in their individual capacities who act in violation of federal law. See Coeur d'Alene Tribe of Idaho, __ ___ _____________________________ S. Ct. __, 1997 WL 338603, at * 6; Ex Parte Young, 209 U.S. 123 ______________ (1908).  Defendants, grasping at text in the district court opinion that suggests a limit on the extent of the Ex Parte Young ______________ doctrine, see 939 F. Supp. at 981 ("The holding of Ex Parte Young ___ ______________ has been limited to actions seeking only declaratory and/or injunctive relief against State officials to halt continuing ____ violations of federal law.")(emphasis added), contend that a federal court, after finding a probable violation by state -26- officials in a citizen suit under the ESA, may literally do nothing more than simply order a cessation of the violation, in the course of fashioning a remedy. Defendants' understanding of the Ex Parte Young doctrine is too broad. The doctrine is _______________ directed only at providing a jurisdictional exception to the traditional Eleventh Amendment sovereign immunity bar by limiting a federal court's jurisdiction to hear a case involving a state defendant to one in which a plaintiff brings suit against a state official, seeking only prospective injunctive relief to "'end a continuing violation of federal law.'" Seminole Tribe of Florida _________________________ v. Florida, 116 S. Ct. 1114, 1132 (1996) (quoting Green v. _______ _____ Mansour, 474 U.S. 64, 68 (1985)). Under this doctrine, a federal _______ court lacks jurisdiction to hear a case in which the plaintiff ____________ seeks retrospective and/or legal remedies. See Edelman v. ___ _______ Jordan, 415 U.S. 651, 666-69 (1974). Thus, the Ex Parte Young ______ _______________ exception to the Eleventh Amendment limits the scope of a district court's jurisdiction to hear a case to those cases requesting prospective equitable relief against state officials, and does not place limits on the scope of the equitable relief that may be granted once appropriate jurisdiction is found. Therefore, defendants' Eleventh Amendment claim is without merit. B. Tenth Amendment B. Tenth Amendment Defendants argue that the district court's power to order injunctive relief is limited by the Tenth Amendment. Specifically, they argue that the Tenth Amendment bars "federal action, that 'commandeer[s] state governments into service of -27- federal regulatory purposes,' because it is inconsistent with the Constitution's division of authority between federal and state governments.'" Appellant's Brief at 46 (quoting New York v. _________ United States, 505 U.S. 144, 176 (1992)). The defendants argue _____________ that the district court's ruling in effect violates federalism principles by commandeering the state's regulatory processes to ban certain commercial fishing activity that the federal agency could ban directly. The defendants' argument is two-fold. They suggest that Congress did not intend to preempt state regulation of commercial fishing when it enacted the ESA, and also claim that the district court's interpretation of the ESA works to preempt state authority to regulate in the area of commercial fishing. The Tenth Amendment provides: The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. U.S. Const. amend. X. Under the federalism structure suggested by the Amendment, "[t]he States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." Garc a v. San Antonio Metro. Transit Auth., 469 U.S. 528, 549 ______ _________________________________ (1985), quoted in New York v. United States, 505 U.S. at 156. It _________ ________ _____________ is certainly true that, while Congress may regulate the conduct of individuals, it may not generally regulate the conduct of the -28- states. See New York v. United States, 505 U.S. at 166 ("The ___ _________ ______________ Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."), quoted in Printz v. United States, __ S. Ct. __, 1997 WL 351180, _________ ______ _____________ at *11 (June 27, 1997). Nevertheless, a valid act of Congress, enacted pursuant to its Commerce Clause powers, seeking to regulate a particular area, is the "supreme law of the land," U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ."), and preempts state laws or regulations that conflict with the act. See ___ Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992); _________ ____________________ Philip Morris, Inc. v. Harshbarger, __ F.3d __, 1997 WL 458881, ___________________ ___________ at *7 (1st Cir. Aug. 28, 1997). With respect to their preemption argument, the defendants contend that Congress did not intend to preempt state regulatory powers, which "'go to the heart of representative government.'" Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) _______ ________ (quoting Sugarman v. Dougall, 413 U.S. 634, 647 (1973)), quoted ________ _______ ______ in Appellant's Br. at 34. When Congress enacted the ESA, it __ intended the Act to be as far-reaching as possible and to prevent any taking of an endangered species, "whatever the cost." TVA v. ___ Hill, 437 U.S. 153, 184 (1978). "[E]xamination of the language, ____ history, and structure of the legislation . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." Id. at 174. The Act's prohibition ___ -29- on takings extends to all private entities and to "any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government." 16 U.S.C. 1532. By including the states in the group of actors subject to the Act's prohibitions, Congress implicitly intended to preempt any action of a state inconsistent with and in violation of the ESA. We agree with the district court that the Commonwealth's regulation of commercial fishing likely results in a taking in violation of the far-reaching prohibitions of the ESA. The district court properly concluded that the scheme as it presently operates cannot continue insofar as its operation is inconsistent with the intent of the ESA. See Palila v. Hawaii Dep't of Land & Nat. ___ ______ _____________________________ Res., 852 F.2d 1106, 1110 (9th Cir. 1988) (upholding injunction ____ ordering state to remove all sheep maintained by state in Palila habitat because habitat destruction by the sheep resulted in a taking of the Palila); Palila v. Hawaii Dep't of Land & Nat. ______ ______________________________ Res., 639 F.2d 495, 497-98 (9th Cir. 1981) (holding that Hawaii's ____ maintenance of feral sheep and goats that destroyed the habitat of an endangered species violated the ESA because the endangered species was threatened by the continuation of that activity); Loggerhead Turtle v. County Council of Volusia County, Florida, _________________ __________________________________________ 896 F. Supp. 1170, 1180-81 (M.D. Fla. 1995) (holding that county's authorization of beach access to vehicles, which disrupted the habitat of endangered species, resulted in a taking in violation of the ESA); see also Defenders of Wildlife v. EPA, ________ _____________________ ___ -30- 882 F.2d 1294, 1301 (8th Cir. 1989) (finding that the EPA's regulatory scheme for the registration of strychnine pesticides violated the ESA by authorizing the use by third parties of the pesticides whose strychnine ingredient was poisoning endangered species and thus supporting the proposition that a regulatory scheme authorizing third parties to engage in actions that result in takings itself violates the ESA).3 We turn to the court's conclusion and order. Defendants wisely do not challenge Congress' authority to enact the Endangered Species Act. Nor do they contend that the Commonwealth's commercial fishing regulations, to the extent that they may conflict with the ESA, survive Supremacy Clause analysis. Instead, the defendants contend that the district court, having found that the Commonwealth's regulatory scheme likely violates the ESA, lacks the authority to order them to form a working group and engage in substantive discussions toward rectifying their statutory violation with working group members whose membership is directed ultimately by the district court. The defendants reason that the district court, through its order, has "commandee[red] the [regulatory] processes of the [Commonwealth] by directly compelling [it] to enact and enforce a federal regulatory program," New York v. United States, 505 U.S. ________ ______________  ____________________ 3 The defendants suggest that Defenders of Wildlife is _______________________ consistent with their position that the ESA acts only upon federal agencies and individuals because it dealt with a federal agency's regulatory scheme. The defendants' proposition ignores the clear language of the statute, which explicitly defines persons who are prohibited from engaging in a taking to include the states and state officials. See 16 U.S.C. 1532(13). ___ -31- 144, 161 (1992), and thereby oversteps the delicate federalism line. The district court did not order the Commonwealth to ban gillnet and lobster pot fishing although the defendants incorrectly, and repeatedly, so claim throughout their brief. Rather, the injunction ordered the Commonwealth to consider means by which gillnets and lobster pots may be modified in order for the Commonwealth to avoid authorizing takings in its coastal waters in violation of federal law. The injunction did not order specific modifications, let alone ban the licensure scheme. Indeed, the court's order did not even command the Commonwealth to restrict its permitting process in any way. Thus, it is impossible to conclude that the district court commandeered or usurped the state's regulatory authority to manage commercial fishing under its regulatory scheme and we reject the defendants' contention that it did so. The defendants' argument revolves around a line of reasoning that we find inapposite in the context of this litigation. The defendants rely heavily on New York v. United ________ ______ States, which discussed the authority of Congress to direct the ______ states to regulate the disposition of nuclear waste produced by the states. See 505 U.S. at 163-67. The Court struck down a ___ provision of the Act as violating the Tenth Amendment's provisions, reasoning that, although Congress may directly require or prohibit certain acts, "it lacks the power directly to compel the States to require or prohibit those acts." Id. at ___ 166. The Court recognized that Congress does not have the -32- constitutional authority "to require the States to govern according to Congress' instructions." Id. at 162. ___ The defendants also cite a Fifth Circuit opinion that relies on the reasoning of New York v. United States to strike ________ _____________ down the Lead Contamination Control Act ("LCCA"), which required states to establish programs for the removal of lead contaminants in school and day care drinking water systems. See Acorn v. ___ _____ Edwards, 81 F.3d 1387, 1392-95 (5th Cir. 1996). Relying on New _______ ___ York v. United States's reasoning barring Congress from directing ____ _____________ the states to enact a particular regulatory scheme, the Fifth Circuit held that the Act's provisions requiring the states to formulate a particular regulatory scheme violated the Tenth Amendment's federalism balance. See 81 F.3d at 1394. ___ Similarly, defendants have directed our attention to Printz v. United States, __ U.S. __, 1997 WL 351180 (June 27, ______ _____________ 1997), which was decided after this case was briefed and argued. In Printz, the Court had before it an act of Congress regulating ______ handguns. The act, referred to as the "Brady Act," required state law enforcement officers, called "chief law enforcement officers" ("CLEOs"), to "make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun by the applicant] would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General." 18 U.S.C. 922(s)(2), quoted in Printz, 1997 _________ ______ WL 351180, at *4. Although the Brady Act does not require the -33- CLEO to take action if he determines that a pending transaction would be unlawful, in the event that he did notify the firearms dealer, he would be required, upon request, to provide the prospective purchaser with a written statement of the reasons for the determination. Printz, 1997 WL 351180, at *4. If the CLEO ______ does not uncover any reason for objecting to the sale, he must destroy all related records. Id. The Court determined that "the ___ Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." Id. The Court recognized ___ that the Constitution places responsibility for administering the laws of Congress on the President. Because the Brady Act instead transferred that responsibility to the fifty states, its provisions were struck down as inconsistent with the provisions of the Tenth Amendment. In reaching this conclusion, the Court followed the reasoning of New York v. United States. ________ _____________ Although the defendants are correct when they assert that the commands of the Tenth Amendment apply to all branches of the federal government, including the federal courts, their arguments under the reasoning of New York v. United States and ________ ______________ its progeny are misguided. The situation presented here is not one in which the district court has directed the state to enact a particular regulatory regime that enforces and furthers a federal policy, as was the situation presented in the caselaw cited by the defendants. In complaining that the district court's order suggests that the Commonwealth must make the choice of either not -34- regulating in a particular area or risking the federal government's commandeering its regulatory processes if it chooses to regulate, the defendants repeatedly align their position with that of the states in New York v. United States and Acorn v. ________ ______________ _____ Edwards.4 The defendants' argument ignores the distinguishing _______ facts of those cases. First, the states in those cases were not found to be in violation of a congressional act passed pursuant to its constitutional authority. Second, the states in those cases were directed to take positive action with respect to a particular field. Here, the defendants are not being ordered to take positive steps with respect to advancing the goals of a  ____________________ 4 Defendants' argument that the situations are comparable is as follows: In fact, New York had "enact[ed] legislation providing for the siting and financing of a disposal facility in New York" in order to obtain the benefits of the federal act in question. New York v. United States, 505 _________ ______________ U.S. at 154. Under the District Court's rationale in this case, therefore, New York should have been required to take title to radioactive wastes pursuant to the federal Low-Level Radioactive Waste Policy Act, because it had not "cease[d] exercising control" over low-level radioactive waste. Likewise under the District Court's rationale, Louisiana in Acorn, should have _____ been required to establish remedial action programs for the removal of lead contaminants from school and day-care drinking water systems pursuant to the LCCA, because Louisiana had distributed to local educational agencies, schools, and day care centers a "fact sheet" published by the Environmental Protection Agency ("EPA") listing non-lead free drinking water coolers. Appellants' Br. at 50. -35- federal regulatory scheme. Rather, the court directed the defendants to find a means of bringing the Commonwealth's scheme into compliance with federal law. The situation faced by the district court, as it correctly recognized, see 939 F. Supp. at 979-80, was one held by ___ the New York Court to be permissible under the Tenth Amendment. ________ The Court, in discussing acceptable uses of congressional authority with respect to the states, recognized that "where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." 505 U.S. at 167. The district court, in answering the defendants' Tenth Amendment challenge, recognized that the Commonwealth has the choice of either regulating in this area according to federal ESA standards or having its regulations preempted by the federal ESA provisions and regulations. Because, for preliminary injunction purposes, the Commonwealth's regulation of this area is inconsistent with federal ESA standards, this situation falls squarely within the permissible balance of federal and state authority recognized by the New York ________ Court and the Commonwealth's regulations are preempted by the federal ESA provisions. We believe that the district court acted within the scope of its equitable powers. The ESA governs the relief available in a citizen suit and authorizes citizen suits to -36- enjoin acts in violation of the ESA. See 16 U.S.C.  ___ 1540(g)(1)(A). "[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." Weinberger v. Romero-Barcel , 456 U.S. 305, 313 (1981) (quoting __________ ______________ Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946)). The ESA ______ __________________ does not limit the injunctive power available in a citizen suit, and, thus, we understand the Act to grant a district court the full scope of its traditional equitable injunctive powers. "Equitable injunction includes the power to provide complete relief in light of the statutory purpose." Ephraim Freightways, ____________________ Inc. v. Red Ball Motor Freight, Inc., 376 F.2d 40, 41 (10th Cir. ____ _____________________________ 1967). In fashioning relief, the district court found it necessary to outline the exact contours of the Commonwealth's violation and the extent of preemption. Toward this end, the district court sought the input and assistance of interested parties, through the creation of the Working Group, which we consider "necessary and appropriate to enforce compliance with the Act." Porter, 328 U.S. at 400. ______ IV. Forcing unwanted relationships IV. Forcing unwanted relationships Regarding the Working Group, the defendants contend that "[e]quity is not intended to force unwanted relationships." Appellants' Br. at 53. In support of this proposition, they cite -37- only Brewster v. Dukakis, 687 F.2d 495 (1st Cir. 1982). In that ________ _______ case, a district court was presented with disputes regarding certain provisions of a consent decree concerning the treatment of mentally ill persons within the Commonwealth of Massachusetts. Id. at 495. In connection with its ongoing supervisory powers ___ over the consent decree, the district court ordered the Commonwealth to create a legal advocacy program on behalf of mentally ill or retarded persons. Id. A panel of this court ___ held that the language and purpose of the consent decree, from which the court's authority over the parties derived, did not empower the district court to order the Commonwealth to pay for a general services program to deal with general issues related to the subjects' disabilities. Id. at 498-500. The court further ___ recognized that the district court did not have the authority to order this remedy based on its general equitable powers because, faced with no admission of liability by the Commonwealth and having found no violation by the Commonwealth, such traditional powers had not been invoked in that case. The instant case is significantly different because the district court found a likelihood that the Commonwealth had committed a statutory violation and thereby its full equitable powers were invoked. Thus, the sole support for the defendants' contention is inapposite, and we find no merit in their argument. V. Irreparable harm to the defendants V. Irreparable harm to the defendants The defendants contend that, given the contentious relationship between the parties, the district court's injunction -38- ordering them to engage in a relationship or dialogue with Strahan inflicts irreparable harm upon the Commonwealth. Although it is generally true in the preliminary injunction context that the district court is required to weigh and balance the relative harms to the non-movant if the injunction is granted and to the movant if it is not, see Romero-Barcel , 456 U.S. at ___ ______________ 312, in the context of ESA litigation, that balancing has been answered by Congress' determination that the "balance of hardships and the public interest tips heavily in favor of protected species." National Wildlife Fed'n, 23 F.3d at 1510. ________________________ The defendants have not cited any authority to the contrary and, accordingly, we follow these precedents in deferring to Congress' pronouncements regarding the weight to be given the endangered species under the ESA and find no error in the district court's order in this respect. VI. Strahan's remaining claims VI. Strahan's remaining claims A. Mandatory immediate injunctive relief A. Mandatory immediate injunctive relief Strahan contends that the district court committed reversible error by refusing to grant the injunctive relief he sought. He contends that the Court in TVA ruled that injunctive ___ relief is mandatory upon a finding of a violation of the ESA. In fact, the TVA Court specifically rejected this proposition, ___ stating "[i]t is correct, of course, that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law." TVA, 437 U.S. at 193. ___ The Court recognized, however, that in the instance presented, in -39- which the activity at issue would have caused eradication of an entire endangered species if not enjoined, the only remedy that could prevent that outcome was a permanent injunction halting the activity. Id. at 194-95. ___ The district court, having determined that the Commonwealth's probable violation of the ESA could be curtailed without such extreme measures, declined to impose the injunction Strahan sought. The district court was not required to go any farther than ensuring that any violation would end. See id. at ___ ___ 193-95; Romero-Barcel , 456 U.S. at 311-16 (holding that, in the ______________ face of a violation of the Federal Water Pollution Control Act, a district court is not required to enjoin any and all activity related to the Act's violation, but instead is charged with developing remedies to ensure the violator's compliance with the Act). We are satisfied that the district court was aware of the need to curtail any violation and bring about the Commonwealth's compliance with the ESA and that its order adequately achieves those ends. B. Error of fact B. Error of fact Strahan argues that the district court erred in finding that "[w]ith the exception of the summer of 1986, '[n]orthern right whales are rarely seen in Cape Cod Bay after May 15." 939 F. Supp. at 968. He supports his claim with information regarding sightings of Northern Right whales through 1995 that he did not present below. We will conclude that a finding is clearly erroneous "only when, after reviewing the entire record, -40- we are left with the definite and firm conviction that a mistake has been committed.'" Clement v. United States, 980 F.2d 48, 53 _______ _____________ (1st Cir. 1992) (quoting Deguio v. United States, 920 F.2d 103, ______ _____________ 105 (1st Cir. 1990)). This claim need not detain us, because, as Strahan points out in his brief, his claim is based on information not presented to the court below and, therefore, it is not properly before this court. "'Except for motions to amend based on newly discovered evidence, the trial court is only required to amend its findings of fact based on evidence contained in the record. To do otherwise would defeat the compelling interest in the finality of litigation.'" Aybar v. _____ Crispin-Reyes, __ F.3d __, 1997 WL 342489, at *25 (June 26, 1997) _____________ (quoting Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th ________ __________________ Cir. 1986)); see also Lyons v. Jefferson Bank & Trust, 793 F. _________ _____ _______________________ Supp. 989, 991 (D. Colo. 1992), aff'd in part, rev'd in part, _____________ ______________ 994 F.2d 716 (10th Cir. 1993). The docket reveals that Strahan has filed no motion to amend this finding, based on newly discovered evidence. "That other evidence not in the record may negate the [d]istrict [c]ourt's inference is beside the point." Fontenot, 791 F.2d at 1220. Strahan may not now claim error in ________ the district court's reasonable finding based on his own failure to present evidence to the lower court. See Aybar, __ F.3d __, ___ _____ 1997 WL 342489, at *25-26. Given the record before it, the district court drew a reasonable inference and relied on that inference in making its findings of fact. We find no error here. C. Strahan's right to conduct full discovery C. Strahan's right to conduct full discovery -41- In his statement of the issues, Strahan contends that the district court erred in denying him his right to full discovery in a civil action in federal district court. Beyond this bare assertion, Strahan fails to argue further in his brief in support of this contention. It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work. . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997) ____ ________________ (citations and internal quotations omitted). Accordingly, we decline to review Strahan's discovery claim. CONCLUSION CONCLUSION For the foregoing reasons, the decision below is vacated in part and affirmed in part. vacated affirmed _______ ________ -42-