The **AMERICAN BALD EAGLE,**
et al., **Plaintiffs, Appellants,**

v.

**Ilyas BHATTI, et al., Defendants,**
**Appellees.**

No. 92–2387.

United States Court of Appeals,
First Circuit.

Heard Sept. 8, 1993.

Decided Nov. 16, 1993.

Florence Mansbach, Wellesley, MA, with whom Steven M. Wise and Fraser & Wise, P.C., Boston, MA, were on brief, for plaintiffs, appellants.

Mary C. Connaughton, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., and Rebbeca Webb, Asst. Atty. Gen., Boston, MA, were on brief, for defendants, appellees.

Before TORRUELLA and STAHL, Circuit Judges, and DiCLERICO,[*] Chief District Judge.

TORRUELLA, Circuit Judge.

The issue to be decided by this appeal is whether the hunting of deer on a Massachusetts reservation significantly affects bald eagles so as to constitute a prohibited "taking" of that endangered species[1] as defined by the Endangered Species Act ("ESA").[2] 16 U.S.C. §§ 1532(19) & 1538(a)(1)(B). How we get from a deer hunt to an allegation regarding the taking of bald eagles requires considerable explanation.

## I. *BACKGROUND*

The Massachusetts Division of Fisheries and Wildlife ("DFW") operates a restoration project for bald eagles on Quabbin Reservation in Eastern Massachusetts ("Quabbin"). This reservation covers an area of approximately 125 square miles and contains a 25,-000 acre reservoir. According to the DFW, the bald eagle population has ranged from a low of 13 in 1982 to an all time high of 45 in 1992. In that year, the statewide population of bald eagles was estimated at 60.

In 1986, the Metropolitan District Commission ("MDC") began to investigate the impact of deer feeding habits on the forest at Quabbin. Among other findings, the study determined that the deer population at Quabbin far exceeded the statewide average of 6–8 deer per square mile. It was concluded that this was the result of a then existing deer hunting prohibition and the decline of natural predators at Quabbin. It was also found that deer consumption of tree seedlings was gradually eliminating the root system necessary for the soil to act as a filter for pollutants. This in turn posed a threat to the quality of water at the Reservoir. After considering a variety of alternatives, the MDC concluded that the only effective means of addressing the underlying problem was to allow controlled deer hunting at Quabbin.

Legislation was subsequently enacted by the State to permit a limited deer hunt at Quabbin under the MDC's authority. Mass. Regs.Code tit. 350, § 8.02 (1991). Thereafter, the MDC, aided by DFW recommendations, developed a deer management plan that attempted to ensure that the eagles would not be disturbed by the deer hunt.

In the fall of 1991, appellants brought this action to enjoin the limited deer hunt on the ground that it posed a significant risk to the bald eagles at Quabbin in violation of the ESA. 16 U.S.C. §§ 1538(a)(1)(B) & 1532(19) (1985). The nucleus of their allegation was as follows: some of the deer shot by hunters during the Quabbin hunt would not be recovered but would die thereafter within the feeding area of the Quabbin bald eagles; these deer, termed "cripple-loss deer," would contain lead in their bodies from the lead slugs used by the hunters as ammunition; and bald eagles would feed on these unrecovered deer carcasses, consume a portion of the lead in the deer, and be harmed by the lead.

The district court denied the preliminary injunction ruling that appellants failed to show a reasonable likelihood of success on the merits. The hunt proceeded as planned. Appellants then requested a permanent injunction which the court also denied because it concluded that the hunt did not pose a

---

[*] Of the District of New Hampshire, sitting by designation.

1. The bald eagle is listed as an endangered species. 50 C.F.R. § 17.11 (1992).

2. The defendant-appellees in this case are Ilyas Bhatti in his capacity as Commissioner of the Metropolitan District Commission and Wayne McCallum in his capacity as Director of the Massachusetts Division of Fisheries and Wildlife.

significant risk of harm to the bald eagles. This appeal followed.

## II. *LEGAL STANDARD*

■ Appellants make two legal challenges to the district court's decision. Appellants first contend that the district court applied the wrong legal standard in holding that they failed to prove that the proposed Quabbin Reservation deer hunt posed a significant risk of harm to its bald eagles. Appellants next argue that the district court erred as a matter of law by failing to define "significant risk." This failure, they argue, under Federal Rule of Civil Procedure 52(a), violated the requirement that the court find the facts specially and state separately its conclusions of law thereon. We review these legal challenges *de novo. In re: Extradition of Howard,* 996 F.2d 1320, 1327 (1st Cir.1993); *Société des produits Nestlé v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 n. 9 (1st Cir.1992).

■ The ESA prohibits the "taking" of an endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as follows: "To harass, harm, pursue, shoot, wound, kill, trap, capture, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Appellants ask that we establish a numerical standard for determining which actions constitute a "taking" of an endangered species. They would have us establish that a one in a million risk of harm is sufficient to trigger the protections of the ESA. We reject this invitation as we find nothing in the ESA, its regulations or legislative history that supports such an arbitrary figure.

Rather than convince us to adopt a restrictive numerical standard for harm under the ESA, appellants' analogies to other regulatory regimes demonstrate that the exact numerical standard for permissible harm or risk of harm varies according to the context. For example, while a risk of one in a hundred thousand has been thought to be appropriate in the context of regulating benzene emis-sions from coke by-product plants, *see* National Emission Standard for Hazardous Air Pollutants, 49 Fed.Reg. 23,521, 23,527 (1984), a definition of one in a million has been considered more appropriate in other circumstances, such as in the analysis of carcinogenicity data, *see* 45 Fed.Reg. 36,942 (Environmental Protection Agency: Proposed Guidelines for Carcinogen Risk Assessment); *see also Public Citizen v. Young,* 831 F.2d 1108, 1112–13 n. 4 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). In the examples cited by appellants, regulatory agencies, like the EPA, adopted numerical risk standards only after consideration of extensive scientific data, publication of proposed standards for public comment, and extensive public hearings. Here, none of these procedures have occurred and appellants provide no other convincing basis for blindly applying a numerical standard developed in another context to the definition of "taking" under the ESA. Furthermore, the cases cited by appellants arise in the context of regulations involving the use of substances that have been scientifically proven to be harmful to humans. *See, e.g., Public Citizen,* 831 F.2d 1108 (carcinogens in food additives); *International Union, UAW v. Pendergrass,* 878 F.2d 389 (D.C.Cir.1989) (OSHA regulation of formaldehyde). In contrast, appellants have presented no studies that have shown that the use of lead slugs in deer hunts has been scientifically proven to cause harm to bald eagles.[3]

The proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of "actual harm." The Secretary of Interior has defined "harm," as it appears in the ESA statute, setting out what constitutes a prohibited taking, *see* discussion *supra* p. 165, as:

an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by signif-

---

**3.** Appellants did present a study showing that the ingestion of No. 4 lead shot caused harm to bald eagles. In that study, eagles were fed ten pellets of lead shot a day for a period of ten to fifteen days. In the present case, however, appellants have not shown that eagles have eaten or will eat any lead slugs (a considerably larger caliber than No. 4 shot) as a consequence of the deer hunts. Furthermore, one of the limitations of the Quabbin deer hunt was that hunters could use only lead slugs, no bullets and no shot.

icantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1992). In formulating this definition, the Secretary has explained that:

Congress made its intent to protect species very clear. . . . in the preamble to the original definition of harm: "Harm" covers actions . . . which actually (as opposed to potentially), cause injury. . . .

The purpose of the rulemaking was to make it clear that an *actual* injury to a listed species must be found for there to be a taking under Section 9.

46 Fed.Reg. 54,748, 54,749 (1981).

Clearly, then, for there to be "harm" under the ESA, there must be actual injury to the listed species. Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species. *See Defenders of Wildlife v. Administrators,* 882 F.2d 1294 (8th Cir.1988) (enjoining the EPA from continuing its registration of strychnine after finding that continued registration of the substance resulted in poisonings of protected species); *Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991) (enjoining the United States Forest Service from even-aged lumbering following documentation by scientists of a dramatic decline in active Red Cockaded Woodpecker colonies and findings by the court tracing the decline directly to Service's lumbering practices). *See also National Wildlife Fed'n v. National Park Serv.,* 669 F.Supp. 384 (D.Wyo.1987) (no "taking" where a plan was designed to reduce conflicts between man and the grizzly bear and in the first season of operation under the plan, there were no bear mortalities).

In this case, appellants have not shown that the hunt caused actual harm. Our review of the record indicates that bald eagles can be harmed by the ingestion of lead. There is, however, no evidence in the record of any harm to the bald eagles at Quabbin as a result of the 1991 deer hunt. *See Pauite Tribe v. U.S. Dept. of the Navy,* 898 F.2d 1410, 1420 (9th Cir.1990) (activity must cause the harm). There is no evidence that any eagles at Quabbin actually ingested lead slug or that any eagles ate deer carrion containing lead slug. After hearing all of the evidence, and considering among other factors the likelihood of the presence of lead in cripple-loss deer, the likelihood of ingestion of lead by eagles feeding on the deer, and the likelihood that if an eagle ingests lead, it will be harmed thereby, the district judge was not persuaded that the bald eagles would be harmed by the proposed hunt. We find that the record fully supports the conclusion of the trial judge.[4]

Appellants' challenge of the district court's decision for allegedly failing to give specific findings under Federal Rule of Civil Procedure 52(a) is also without merit. The district court clearly stated the relevant statutory and regulatory provisions. To the extent that the district court's decision rested upon an interpretation of these provisions that varies from that which we have established, the court employed a more liberal interpretation of the statutory requirements.[5] Moreover,

---

**4.** We note that the ESA definition of "take," includes the term "harass." 16 U.S.C. § 1532(19). The regulations of the United States Fish and Wildlife Service define "harass" as:

an intentional or negligent act which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3 (1992).

Because appellants have not shown that bald eagles have ingested lead slugs nor fragments thereof during past hunts or will ingest lead slugs or fragments thereof during future hunts, we have no reason to consider whether the ingestion of lead slugs or fragments thereof would lead to a disturbance of the eagles' behavior pattern to the extent that it would amount to "harassment" of the bald eagles.

**5.** The district court correctly stated that the issue to be decided was "whether the hunt will cause harm or whether it will harass, or cause the [b]ald [e]agle to be harassed." The parties agreed that the plaintiffs had the burden of proof and that in order to prevail they must show that "the deer hunt poses a significant risk of harm to the [b]ald [e]agle." By requiring the plaintiffs to show only "a significant risk of harm" instead of "actual harm," the district court required a lower degree of certainty of harm than we interpret the ESA to require. The appellants certainly cannot meet this court's standard of "actual

the court made clear factual findings. As such, appellants' Rule 52(a) challenge fails. We do not find it necessary for the court to numerically define the standard it applies in order to comply with this rule. Furthermore, we find that the record adequately supports a finding that the proposed deer hunt does not constitute a "taking" within the meaning of the ESA.[6]

## III. CREDIBILITY OF WITNESSES

Appellants claim that the district court clearly erred by discounting the testimony of appellants' experts and finding more credible the testimony of appellees' experts regarding the effect of the deer hunt on bald eagles at Quabbin.

■ We review the district court's credibility findings for clear error. *Brennan v. Carvel Corp.*, 929 F.2d 801, 806 (1st Cir.1991) (in non-jury trials, findings of fact based on oral or documentary evidence should only be set aside for clear error). *See also Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1984) (where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous). On the record presented, the district court did not err. Thus, we affirm the findings of the district court.

## IV. EXCLUSION OF APPELLANTS' EXHIBITS FROM EVIDENCE

■ Appellants posit that the lower court erroneously excluded appellants' exhibits 11, 11A, 11B, 11C, 12 and 13 from evidence. We disagree. Appellants offered as exhibits highlighted portions of documents which the court found to contain only portions of sentences taken out of context. These exhibits were offered by appellants as either self-authenticating documents or admissions. Appellees objected to their admission on the grounds of completeness and that the statements were taken out of context and stated during trial "we only prefer ... that the entire document be admitted in evidence, as opposed to highlighted portions."

Pursuant to Federal Rule of Evidence 106, "[w]hen a writing ... or part thereof is introduced by a party, an adverse party may require the introduction ... of any other part ... which ought in fairness be considered contemporaneously with it." Appellants argue in their briefs that "as the defendants did not even dispute the admissibility of the entire documents, the Court was bound to accept the portions offered by the plaintiffs and allow the defendants to offer any additional portions...." The record shows that it was not appellees, but appellants who vehemently opposed admitting into evidence the entire document which would put the phrases contained in their offered exhibits into context. In essence, before making a final ruling on the admissibility of these statements, the lower court let appellants choose whether the entire documents or no portions thereof would be admitted. The court did not abuse its discretion in refusing to admit only misleading portions of docu-

---

harm" if the district court found that they failed to prove that even a "significant risk of harm" existed.

6. We are aware of the decision of *National Wildlife Federation v. Hodel*, 23 Env't Rep.Cas. (BNA) 1089, 1985 WL 186671 (E.D.Cal. Aug. 26, 1985) in which a court enjoined hunting of migratory birds with lead shot, finding a "taking" of the bald eagle. We believe that the present case is easily distinguishable. In *National Wildlife*, the defendant had published a proposed rule stating that "there is a substantial likelihood that lead shot used by waterfowl hunters poses a threat to bald eagles" and significant evidence indicated that most lead shot that poisons bald eagles is consumed by the eagles when they feed upon other migratory birds that are themselves either ill due to consumption of lead shot, or have been wounded or killed by lead shot but not retrieved by hunters. In the present case, the defendant made no such admission and the evidence did not indicate that eagles were poisoned by feeding on deer carcasses. *Id.* at 1090. Furthermore, the present case concerns the use of lead "slugs" rather than lead "shot."

ments taken out of context.[7]

*Affirmed.*

---

**7.** We have no occasion to review the lower court's finding that the exhibits appellants sought to admit into evidence contained portions of sentences taken out of context. Appellants do not argue that they were in context and on appeal, they have supplied us with entire pages taken from those documents from which it is impossible to ascertain which portions they wished admitted.