UNITED STATES of America, Plaintiff,

v.

TOWN OF PLYMOUTH,
MASSACHUSETTS,
Defendant.

No. CIV. A. 98–10566–PBS.

United States District Court,
D. Massachusetts.

May 15, 1998.

George B. Henderson, U.S. Attorney's Office, Boston, MA, for U.S.

John W. Giorgio, Kopelman & Paige, P.C., Boston, MA, Mark R. Reich, Kopelman and Paige, P.C., Boston, MA, for Town of Plymouth, Mass.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiff, the United States Fish and Wildlife Service ("Service") requests a preliminary injunction prohibiting the Town of Plymouth, Massachusetts from allowing off-road vehicles ("ORVs") to drive on Plymouth Long Beach unless appropriate precautions are taken to protect piping plovers, which are listed as "threatened" under the Endangered Species Act, 16 U.S.C. §§ 1531–1543 ("ESA").

After hearing, the Court concludes that the United States is likely to succeed on the merits of its claim that ORVs have in the past caused the illegal "take" of piping plovers on Long Beach by killing one chick, and by substantially interfering with the breeding, nesting and feeding habitat of piping plovers in Zone 2 of that beach, and that future "takes" will occur unless an injunction is issued. After hearing and review of the affidavits, videotapes, and documents, I issue a preliminary injunction which bans ORVs from Zone 2, unless the Town follows certain requirements drawn from federal and state guidelines, most notably to maintain minimum vehicle-free buffer zones around piping plover nests and unfledged broods.

## FINDINGS OF FACT

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact. *See Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1481 (1st Cir.1996).

### 1. *The Plight of the Piping Plover*

The Court relies extensively on the declaration of Dr. Scott M. Melvin, a Rare Species Zoologist with the Massachusetts Division of Fisheries and Wildlife, which was largely undisputed, in making the following findings regarding the impact of recreational activities, including ORV use, on piping plover behavior and habitat.

Dr. Melvin has a Ph.D. in Wildlife Ecology from the University of Wisconsin–Madison (1982), an M.S. degree in Natural Resources and a B.S. degree in Wildlife Management. His principal areas of expertise are in avian ecology and endangered species conservation. From 1986 to the present, he has been an adjunct Assistant Professor in the Department of Forestry and Wildlife Management, University of Massachusetts–Amherst. He has evaluated habitat conditions and the status of plover and tern protection programs at about 70 of the approximately 80 sites where piping plovers currently nest in Massachusetts, including Plymouth Long Beach.

Piping plovers are small, sand-colored shorebirds that nest on sandy, coastal beaches from North Carolina to Newfoundland. The United States Atlantic Coast population was estimated at approximately 1,200 breeding pairs in 1997, and in 1996, 452 of these pairs nested on Massachusetts beaches. The Service lists the Atlantic Coast population as "threatened" under the Endangered Species Act of 1973 and the Massachusetts Division of Fisheries and Wildlife ("the Division") also lists it as threatened under the state Endangered Species Act.

Piping plovers nest on coastal beaches above the high tide line, on sand flats at the end of sand spits near gently sloping foredunes, and in unvegetated "blow-outs" created by wind and wave action behind or between coastal dunes. Nests are simple "scrapes" in the sand and consist of mixtures of sand, gravel and shells. They are placed on open sand or in patches of sparse to moderately dense beach grass and other dune vegetation.

Piping plovers return to nesting beaches in Massachusetts from mid-March through May. Nesting may occur from mid-April through late July. Clutch size is usually four eggs, and eggs are incubated for 27–28 days before hatching. Piping plovers usually fledge only a single brood per season, but may renest several times if previous nests are lost. Dr. Melvin describes the chicks as follows:

> At hatching, Piping Plover chicks weigh only 0.2—0.3 ounces and stand approximately 2.5 inches tall. Plover chicks are precocial, meaning that they are able to move about and search for food within hours after hatching. Most broods leave the nest scrape within 24 hours after hatching and do not return. Chicks may move hundreds of yards from the nest site during their first week of life. Chicks remain together with one or both parents until they are able to fly (referred to as fledging), generally between 25 and 35 days of age. Depending on date of hatching, unfledged chicks may be present from late May until mid-August. In Massachusetts, most have fledged by late July or early August.

(Melvin Decl. ¶ 11.)

Adults and chicks feed on small invertebrates such as amphipods, sand fleas, flies, beetles and marine worms. The most important feeding habitats for both adults and chicks are the intertidal zones of beaches and "wrack." The term "wrack" refers to the strips of seaweed, vegetation, shells and other organic debris deposited on the beach by the tides and storms. Piping plover chicks typically triple their weight during the first two weeks of life; those that fail to achieve at least sixty percent of this weight gain by day 12 are unlikely to survive.

Chicks and, occasionally adults, are vulnerable to mortality caused by ORVs. Chicks are particularly susceptible to death or injury from ORVs because they typically leave the nest within hours after hatching and move extensively from the upper beach to feed in the wrack or intertidal zone. Chicks may

move out of protected areas into dangerous vehicle-use areas unless adequate buffers are maintained. They stand in, walk and run along tire ruts, and sometimes have difficulty crossing or climbing out of deep, steep-sided ruts. One study observed that broods can move more than 200 meters in less than five minutes, and some broods forage more than 1,000 meters from where they hatched; even downy chicks can run 25 meters in 12 seconds. Still, chicks sometimes stand motionless or crouch as vehicles pass by in an attempt to blend into the sand or do not move quickly enough to get out of the way.

Dr. Melvin has reviewed the circumstances surrounding twenty incidents in which a total of 25 piping plover chicks and two adults were found dead in ORV tire ruts on the upper beach between the mean high tide line and the foredune in Massachusetts and New York between 1989 and 1997. He concluded: "In my opinion, if recreational vehicles are allowed to drive or park on Plymouth Long Beach less than 100 yards from unfledged Piping Plover chicks, it is highly probable that chicks will be killed, harmed, or harassed." (Melvin Decl. ¶ 15.) Thus he recommends that 100 yards is a very conservative minimum buffer needed to protect plover chicks from ORVs.

In addition to the running-over of chicks and adults, Dr. Melvin states that ORVs are likely to have substantial adverse effects on the piping plovers' nesting and feeding habitat. With respect to nesting, ORVs which are parked side-by-side along the upper beach and intertidal zone and those which drive along the lower portions of foredunes and in washover areas will destroy habitat that would otherwise be suitable for courtship and nesting. With respect to feeding, adverse effects are likely to occur when vehicles physically occupy the feeding habitat along the upper beach and in the intertidal zone, thereby disturbing feeding plovers, crushing and burying wrack, and creating deep ruts that may impede the movements of chicks. One study showed that feeding chicks can be disturbed by passing vehicles to the point where they stop feeding and move from the sources of disturbance. Vehicles parked side-by-side along the beach also

constitute a disturbance that can prevent chicks or adults from feeding on those sections of the beach. (Melvin Decl. ¶¶ 24, 25.) The combined adverse effects of ORVs are especially severe to unfledged piping plover chicks because they cannot fly to other beaches. (Melvin Decl. ¶ 26.)

### 2. *Plymouth Long Beach*

Plymouth Long Beach is a narrow barrier beach approximately 2.8 miles long that extends in a southeast to northwest direction into Plymouth Bay. The Town of Plymouth owns approximately 70 percent of Plymouth Long Beach, with the remainder held in private ownership. There are 18 private residences on the beach.

The beach provides important habitat to a variety of migratory shorebirds, including various terns and the piping plover. It also is a location for year-round recreational activities, including ORV use. The Town sells beach stickers authorizing ORVs to travel on the beach. Property owners on Long Beach get stickers free of charge. The beach is heavily used by ORVs, especially during the summer months. The numbers of permits sold within the last seven years are as follows: 2625 in 1991; 2701 in 1992; 2203 in 1993; 2177 in 1994; 2478 in 1995; 2098 in 1996 and 1156 in 1997. Under the Town by-laws, vehicles are allowed onto the beach from 4:00 a.m. until 9:00 p.m. and 24 hours a day for fishermen, property owners, their guests and campers, with special permits, except in certain protected areas. Up to 325 vehicles can be admitted at one time. Pictures suggest that on hot summer days, the beach looks like a shopping mall at Christmas, with cars parked side-by-side along the beach.

In 1985 the Plymouth Beach Advisory Committee ("PBAC"), consisting of interested residents of the Town of Plymouth, was established to advise the Board of Selectmen on issues relating to Plymouth Long Beach.

### 3. *Beach Management*

John E. Crane, a Plymouth resident, was employed from July 1987 to September 1997 by the Town of Plymouth, Park Division, as the Beach Conservation Officer (later re-

named the Natural Resources Officer ("NRO")). His direct supervisor was Douglass Gray, the Plymouth Parks Superintendent. Gray's superior was Leighton Peck, the Public Works Director.

Charged with managing the town-owned portions of Plymouth Long Beach, Crane was on that beach on a daily basis, generally five days a week, often for eleven or more hours per day during the summer months. His duties included the enforcement of state and federal endangered species laws and regulations. During his ten-year tenure as Beach Conservation Officer, he gained substantial on-the-job experience and training concerning the nesting, foraging, and breeding habits of shore birds on Plymouth Long Beach, including the piping plover. Crane was also an assistant member of the Plymouth Conservation Commission from 1991–1996.

In an Order of Conditions, dated April 29, 1992, the Plymouth Conservation commission adopted an ORV/Wildlife Management Plan (the "1992 Plan"), which was superseded by an order of the Massachusetts Department of Environmental Protection (DEP) on September 25, 1992. Under the 1992 Plan, Long Beach is divided into four zones. Zone 1, near the parking lot, has, in the past, not been considered to be a suitable habitat for the piping plover and can be open at all times. Zones 3 and 4, encompassing areas at and near the northern tip of Plymouth Long Beach are closed to ORVs from April 1 to September 15.

Zone 2—the zone primarily involved in this litigation—is open to ORVs at all times except for symbolically fenced areas.[1] The 1992 Plan requires that symbolic fencing be left in place until either the chicks are

fledged or it is clear that the chicks are no longer using the fenced areas. It does not contain any provisions for the monitoring of plovers or the expansion of symbolically fenced areas within Zone 2 to protect mobile plover chicks after they have hatched and before they have fledged. Originally, Zone 2, on the east side, had been delimited by the "crossover" extending northerly to the "stone jetty." However, the superseding order, over objection, had expanded Zone 3, and thus the prohibition of ORVs in Zone 3, to 790 feet south of the stone jetty. The town, in 1993, had requested an amendment of the superseding order of conditions that would have expanded Zone 2 back to its original size; that request was denied by the DEP on January 12, 1994.

In April 1993, the Division issued "Guidelines for Managing Recreational Use of Beaches to Protect Piping Plovers, Terns, and their Habitats in Massachusetts," which called for intensive monitoring of plover nests so that the hatching dates could be predicted and confirmed, and for the closure of larger areas once eggs have hatched so that precocial (i.e. mobile and self-feeding) chicks could be protected. In April 1994, the Service issued federal "Guidelines for Managing Recreational Activities in Piping Plover Breeding Habitat on the U.S. Atlantic Coast to Avoid Take under Section 9 of the Endangered Species Act." By the Service's own admission, the guidelines are not binding on the Town of Plymouth, but instead represent "the Service's best professional advice" as to how to prevent takings of piping plovers due to recreational use.[2] As such, the Town of Plymouth's failure to implement the guide-

1. "Symbolic fencing" refers to one or two strands of light-weight string, tied between posts to delineate areas where pedestrians and vehicles should not enter. It is placed around areas where there are nests, viable eggs or unfledged chicks, and is intended to prevent accidental crushing of nests, flushing of incubating adults, and to provide an area where chicks can rest and seek shelter when large numbers of people are on the beach. (Von Oettingen Att. A. at p.6.)

2. Stripped down to their basic points, the guidelines recommend: (1) the maintenance of buffer zones of at least a 50 meter radius around each nest, to be delineated with warning signs and

symbolic fencing; (2) the prohibition of vehicular access into or through posted nesting areas; (3) the delineation of vehicle corridors along side the edge of plover habitat for access prior to hatching; (4) the temporary closing—to all vehicles not deemed "essential"—of all dunes, beach and intertidal habitat within the chicks' foraging range on (or before) hatching, where unfledged chicks are present; and (5) the intensive monitoring, by a qualified biologist(s), of the mobility of unfledged broods in order to implement adjustments to the size and location of protected areas.

lines does not constitute a violation of the ESA.

Prior to April 1 of each year, Crane would locate likely piping plover nesting areas and erect symbolic fencing around the areas using metal stakes and string. Where he found nests, he would adjust the symbolic fencing to establish a protective area with a radius of 150 feet around each nest as required by the 1992 Plan. However, under that plan, if such fencing would restrict ORV access along the beach, the fencing could be closer to the nest to allow for access. Crane remembers one instance in which a pair of plovers was nesting within 15 feet of the symbolic fence, and another where the radius was 40 feet. He was the only town employee managing and monitoring wildlife, although he was periodically assisted by the Massachusetts Audubon Society. He did not expand fenced areas to protect hatched plover chicks during their precocial stage.

When Zone 2 was open to ORVs, according to Crane, the traffic would cause the wrack line to become completely ground into the sand, effectively destroying the source of food for foraging birds. Also, multiple vehicle ruts, varying from four to eight inches in depth, created obstacles to unfledged plover and tern chicks. During good weather in the summer and especially on weekends, ORVs would typically be present in significant numbers—up to 250 vehicles.

Crane cites two reasons for his failure to manage Plymouth Long Beach in a manner consistent with the federal and state guidelines. First, he states, "my efforts to establish protective zones around Plover habitat were the subject of substantial criticism by the PBAC and Town Selectmen. On several occasions I was accused of improperly expanding the symbolically fenced areas in a manner inconsistent with the 1992 Plan. The PBAC, local citizen interests, and certain Selectmen called for my dismissal." (Crane Decl. ¶ 20.) Crane believed that "the unwritten policy of the Town has been to erect the symbolic fencing so as to establish only minimal protection zones around the actual nest sites." (Crane Decl. ¶ 44.) In addition, he lacked the time and resources to monitor the plovers.

4. *Birds On The Tracks*

In 1993, two terns had been run over by ORVs during the evening hours of May 20, and on July 13, 1993, fourteen tern chicks had been found dead in vehicle tracks on the beach. The selectmen were informed. When a piping plover nest was found in Zone 2, at the recommendation of the state and federal wildlife authorities, Crane requested the authority of the town to close the appropriate area of the beach when the eggs hatched. While Dr. Melvin had recommended that the beach be closed 100 yards on either side of the brood, Crane was instead directed to temporarily expand the buffer zone around the nest site where the chicks were present and keep the chicks under supervision. On July 16, 1993 Melvin traveled to Plymouth Long Beach accompanied by State Ornithologist Bradford Blodget, and met Crane and Gray on the beach at 9:15 a.m. Lacking the authority to close the beach, they kept the chicks under constant surveillance through the mid-afternoon. Melvin describes the results as follows:

> In my opinion, our constant presence near the chicks over the next 2.5 hours, trying to protect them and keep them all constantly in view, combined with the continued passage of vehicles and growing numbers of vehicles parked on the beach, disturbed the adult plovers enough to stimulate them to move their brood down the beach, until at mid-day they were trapped between us and over 40 parked vehicles with people and pets on a relatively narrow upper beach backed by steep dunes. I believe that the presence of large numbers of passing vehicles and people prevented the chicks from feeding along the lower beach from approximately 10 am until after 3 pm.

(Melvin Decl. ¶ 33.) Because the expanded buffer zone was still small, disturbance by ORVs and beachgoers likely caused three chicks to move, with great difficulty, north and then to the west side of the beach; only two of the three chicks were seen alive after that day. Also, one unhatched piping plover egg from the nest of the plovers that had moved out remained unattended. Special

Agent Christopher Dowd of the Fish and Wildlife Service took photos around the nest which indicate that the beach was deeply rutted and one sign had been knocked down.

During 1994 and 1995, Crane's management efforts met with similar resistance until the Division intervened. When he attempted to expand the symbolically-fenced areas because of the presence of plovers, he was criticized. Symbolic fencing was found destroyed and vehicle tracks were found in closed areas. In July 1994, over a period of three days, Crane found five juvenile least terns dead in ORV tracks in Zone 2. In the Spring of 1995, a piping plover nest was located in Zone 2. Crane states that because of "pressure from Town officials and Town residents the buffer between the nest and the symbolic fencing was narrow to allow more room for ORVs." (Crane Decl. ¶ 24.) When the Division recommended the creation of a 100–yard buffer zone on each side of the chicks on June 28, 1995, Town Manager William Griffin decided to close the beach until the chicks reached 35 days of age or were able to fly, whichever came first.

### 5. *Plundered Plover*

On June 10, 1996, Crane advised Town Manager Don Jacobs that one of the plover nests had hatched. Crane was particularly concerned about a nest near the "cross-over" and the need to require the restriction of ORV access at this location. At around 12:00 noon on June 12, 1996, he observed "starring," which refers to the appearance of radial cracks in the shell caused by pressure from the beak of the chick against the shell wall. Later that day he met with Jacobs, Grey and Peck and warned that the nest would be hatching soon and that the chicks would be at great risk of being killed by ORVs if the beach were not closed. Jacobs did not authorize him to close the beach and told Crane that the issue would be taken up with Board of Selectmen Chairwoman Teagan and Selectman Silva at a prescheduled meeting the next morning.

Crane believed that the beach should be closed immediately and called the Division. On the morning of June 13, 1996, he went to

monitor the plover nests. At approximately 6:35 a.m., he observed that the four eggs in the nest had hatched. The chicks were "fluffed out" meaning that their feathers had dried, and they were moving within the nest depression. All appeared healthy. The symbolic fencing had been placed much closer to the nest than the 150 foot radius recommended by the state and federal guidelines; it was only about 40 feet away from the nest in the direction of the water in order to allow for ORV access. Crane asked Michelle Carley and Diane Lahaise, who were affiliated with the Manomet Bird Observatory, to keep an eye on the four plover chicks, and he then left the beach to attend the Board meeting.

Crane failed to get authorization from the selectmen to close the beach. Teagan said she wanted more documentation from the Division before permitting a vehicle closure and Silva walked out of the meeting before it ended at about 11:00 a.m. Jacobs told Crane to get a letter from the Division confirming in writing that the beach should be closed and the reasons for it. Dr. Thomas French sent that written recommendation to close the beach to vehicles immediately by fax.

When Crane returned to Long Beach, he encountered several ORVs which he told to leave. At 12:00 p.m. he arrived at the nest where Carley, Lahaise and Ted Laska, an intern with the Massachusetts Audubon's Coastal Waterbird Program, had found a dead piping plover chick in a vehicle track. In light of the location of the dead chick, the absence of any indication of disease, and the available medical evidence, including a necropsy report,[3] Dr. Glenn H. Olsen, a veterinarian and wildlife biologist, concluded that the likely cause of death was that the chick had been crushed by an ORV. The wildlife forensic pathologist's necropsy report had listed the cause of death as "Suspect Blunt Trauma." (Ralston Decl. ¶ 7.) The dead chick was given to Special Agent Christopher Dowd of the U.S. Fish and Wildlife Service.

Most of Zone 2 continued to be closed to ORV traffic until after the plover chicks had fledged in late July or early August, 1996. By the end of August 1996, seven pairs of

---

3. "Necropsy" refers to the autopsy of an animal.

piping plovers, three of which nested in Zone 2, had successfully fledged nine chicks.

### 6. *Crane In Effigy*

On August 12, 1996 Gray and Crane sent a memorandum to Jacobs recommending that the town implement specific procedures consistent with the federal and state guidelines to be followed regarding ORV restrictions after the hatching of piping plover eggs. These were revised in November 1996. However, the PBAC, which had discussed the changes with the Service, did not endorse, or even debate, the recommendations at its meeting. Because the Town appeared not to be moving towards acceptance of the recommendations, in early 1997 the Service and the Solicitor's Office of the United States Department of the Interior began discussions with the Town Manager regarding a proposed Memorandum of Agreement ("MOA") that would commit the Town to complying with the state guidelines for the protection of piping plovers in lieu of the assessment of a civil penalty. After the Town Manager and Dr. French signed this MOA in early June, 1997, Crane managed the beach during June and July 1997 in accordance with the federal guidelines. Under these guidelines substantial portions of Zone 2 were closed to ORV traffic from mid-June through mid-August 1997. On July 29, 1997, Dr. Melvin participated in a site visit at Plymouth Long Beach regarding a proposed beach nourishment and dune-building project. Also at the gathering were two members of the PBAC, two Selectmen, and several private citizens. A representative of the PBAC told Melvin that he strongly disagreed with the timing and location of vehicle closures to protect plover chicks under the Memorandum of Agreement.

Many Plymouth residents were irate about the beach closure and a petition with 500 signatures was presented to the Board of Selectmen. A hearing before the Board of Selectmen was held on August 5, 1997. It was jam-packed with piping mad citizens who wanted to "take our beach back" from the "bird watchers." Selectman Lane began the hearing by criticizing the Town Manager and Town Counsel for entering into the MOA without first presenting it to the Board because it made policy changes in beach management. Calling the MOA "rotten to the core, every single sentence of it," Selectman Teagan disagreed with the statement of the MOA that "[a] particular problem results from the use of ORVs, driving on the beach," and stated: "The board of Selectmen in Plymouth has never subscribed to that. We have actually taken the opposite approach, and as a policy, that there's room for the birds and the people and the vehicles, and kite flyers seem to have lost, but—and whatever else on that beach, that is a multipurpose-use beach." (Dowd Decl., Tab 4, Tr. 8, 22.) Lambasting Crane not only for his inadequate management of beach erosion and trash maintenance, but also for his willingness to close the beach, one citizen showed a picture of the beach with Crane appearing to be hung in effigy. When Ted Kraska, the student who had found the dead plover, attempted to speak about the need to protect the birds, he was booed. While one citizen spoke about the need to find "common ground," the consensus was to the contrary. The Board of Selectmen voted to rescind the MOA with the Service at the hearing.

On September 4, 1997, Crane was fired. Town Manager Donald Jacobs states that he was terminated due to his failure to carry out the 1992 Plan developed by his supervisor, Douglass Gray; his failure to communicate with the PBAC; and his failure to communicate with the Board of Selectmen.

### 7. *Impasse*

By the end of August 1997, nine piping plover nests were discovered in Zone 2 and three nests were found in Zones 3 and 4. Only four pairs successfully fledged a total of ten chicks. Much of the loss of chicks was thought to have been due to Hurricane Danny in July. In 1997, the Town hired a Natural Resources Technician (a seasonal position) to provide for the monitoring of piping plover nesting sites, and up to four full-time Natural Resources Technicians altogether. In addition, the Town created the seasonal position of Natural Resources Assistant to provide for the twenty-four hour coverage of the vehicle restricted areas on Plymouth Long Beach.

Altogether in 1997, the Town employed six full-time and one part-time Natural Resources Assistants.

On October 7, 1997, Dr. Melvin and Susanna Von Oettingen, an Endangered Species Biologist with the Service, met with members of the Plymouth Board of Selectmen, the Town Manager, and representatives of the Service to indicate where the 1992 Plan needed specific changes to conform to the state and federal guidelines for protecting piping plovers and their habitats. The Town rejected the suggested changes on January 14, 1998.

On March 25, 1998, state and federal officials met with town officials to recommend delineation of piping plover nesting habitat areas within Zone 2 and Zone 3 that should be protected by symbolic fencing. On March 31, 1998 the complaint was filed.

On April 1, 1998, the state government sent the Town of Plymouth notification that the 1992 Plan was due to expire on September 25, 1998, and that it was not in compliance with applicable guidelines with respect to vehicle management on barrier beaches that support habitat for rare and endangered species. On April 10, 1998 the United States filed its motion for preliminary injunction.

On April 21, 1998, the Board of Selectmen adopted "Proposed Long Beach Maintenance Tasks and Guidelines for Management Procedures of Piping Plovers, Terns and their Habitats for 1998" (the "1998 Protocol"). At hearing, counsel informed the Court that the 1998 Protocol was substantially similar to, and essentially a "ratification" of, the 1992 Plan.

Piping plovers arrived at Plymouth Beach on March 31, 1998. Currently there are eight to ten pairs of piping plovers just north of the crossover to the tip of the barrier beach. One nest is due to hatch on May 23rd. The new NRO, Richard A. Souza, intends to impose a vehicle-free zone of 100 meters (330 feet) to protect the brood.

*CONCLUSIONS OF LAW*

A. *Standard of Review*

"In ruling on a motion for preliminary injunction, a district court is charged with considering: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997) (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)). "Under the ESA, however, the balancing and public interest prongs have been answered by Congress' determination that the 'balance of the hardships and the public interest tips heavily in favor of protected species'." *Id.* (quoting *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1510 (9th Cir.1994)). Examination of the language, history and structure of Section 7 of the ESA indicates "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (holding that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity); *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987) (holding that the courts may not use equity's scales to strike a difference balance).

B. *The Merits*

1. *The ESA*

The ESA was enacted in 1973 with the express purpose of "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" through the development of a program to protect such endangered and threatened species, and through the enforcement of various treaties and conventions within the Act, which set forth national and international standards. 16 U.S.C. § 1531(b). Congress vests the Secretary of the Interior (the "Secretary") with the power to promulgate regulations listing those species that have become "endangered" or "threatened." *See* 16 U.S.C. § 1533(a)(1); *see also* 16 U.S.C. § 1532(15). An "endangered species" is defined by the Act as "any species which is in danger of extinction

throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Pursuant to this statutory grant of authority, the Secretary has designated the Atlantic Coast population of the piping plover as a threatened species. *See* 50 C.F.R. § 17.11 (1997).

Once a species is designated as endangered or threatened, the protections afforded by the ESA and its regulations are triggered. *See* 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) and (G); 50 C.F.R. §§ 17.21(c), 17.31(a) (1997). The ESA prohibits any person from "taking" any endangered species within the United States. *See* § 1538(a)(1)(B). The term "take" is defined to mean "to harass, pursue, hunt, shoot, would, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The regulations further define the terms "harm" and "harass" as follows:

> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification, or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.
>
> \*     \*     \*     \*     \*     \*
>
> ■ Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1997). A "take" is construed "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Strahan,* 127 F.3d at 162 (quoting S.Rep. No. 93–307, at 7 (1973); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 703–04, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995))(same). Moreover, the ESA's prohibitions contemplate both the actions of individuals who directly take a species and those of a third party authorized by the government to engage in activity resulting in a taking. *See* 16 U.S.C. § 1538(g) ("It is unlawful for any person ... to attempt to commit, solicit another to commit, or cause to be committed, any offense" prohibited by the ESA); *see also Strahan,* 127 F.3d at 163 (holding that "[t]he statute not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking").

■ The ESA specifically authorizes the Attorney General, acting on behalf of the United States, to "seek to enjoin any person who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." 16 U.S.C. § 1540(e)(6). In order for the United States to prove a likelihood of success on the merits, it must demonstrate that the Town of Plymouth has caused, through action or inaction, the illegal taking of the piping plover on Plymouth Long Beach or that future takes will occur if management of the beach continues on its present course. Proof of a taking requires a showing "that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species." *American Bald Eagle v. Bhatti,* 9 F.3d 163, 166 (1st Cir.1993) (citing cases); *see also Strahan,* 127 F.3d at 162. A movant can make a showing of actual harm by proving that significant modification or damage to the habitat of an endangered or threatened species is likely to occur so as to injure that species. *See TVA,* 437 U.S. at 172, 98 S.Ct. 2279. In *TVA v. Hill,* the Supreme Court stated that "some" may find it "curious" that an endangered three-inch fish, the snail darter, could stop a $100 million dam under the ESA, but that "the explicit provisions of the [ESA] require precisely that result." *Id.* at 172–73, 98 S.Ct. 2279. Similarly, here a 2.5 inch piping plover can stop a behemoth ORV if the government proves a taking under the ESA.

### 2. *Proof of Harm*

■ The Service has proved a likelihood of success on its claim that current manage-

ment practices with respect to ORV access to Plymouth Long Beach have actually harmed piping plovers and will continue to cause harm to the species if they remain unchecked. Plymouth's persistent refusal over the last five years to undertake adequate and timely precautionary measures on the initiative of those town officials responsible for management of the beach creates a likelihood that piping plover chicks will be killed and disturbed and that the nesting and feeding habitat will be adversely modified during the upcoming breeding season.

The Town points out that Plymouth Long Beach has experienced an increase in the number of nesting pairs of piping plovers from one in 1991 to nine in 1997, and that the piping plover population is "flourishing" under the Town's "upgraded" management of the beach under the 1992 Plan. Douglass Gray, the Superintendent of Parks and Forestry, claims he is empowered by the by-laws to limit the number of vehicles and by the 1998 Protocol to create "vehicle-free zones for nonessential vehicles where unfledged (flightless) piping plover chicks are present." (See 1998 Protocol at p. 3, ¶ C). I do not doubt the good faith or diligence of those employees entrusted with managing Long Beach and with monitoring the piping plover. However, as a matter of unwritten policy and practice, these employees do not have the authority on their own to take necessary measures to create adequate vehicle-free buffer zones.

Rather, there is compelling evidence that certain selectmen and at least one town manager have failed in the past to take prompt measures to close the beach to ORVs to protect nests and unfledged piping plover chicks and have instead declined to authorize a beach closing until state or federal officials intervened and recommended the closures in writing. Moreover, the lack of authority vested in the NRO to close the beach on his own volition to protect piping plovers and the absence of mandatory requirements in the 1998 Protocol with respect to minimum buffer zones for unfledged chicks have restricted the NRO's ability to prevent takes.

This failure to act quickly and decisively resulted, in all probability, in the June 13,

1996 taking of the plover chick. While the Town maintains that no conclusions can be drawn about the cause of the death of the recently hatched plover—observed healthy in the morning and found dead in vehicle tracks just hours later—the reasonable inference to be drawn in this whodunit is that the chick was killed by an ORV. Although the Selectmen perceive Long Beach as a multipurpose beach where ORV users and piping plovers can happily co-exist, the expert evidence proves that the large vehicle-free zones are essential to protect this threatened species from takes, and will often be inconsistent with ORV use during the summer months.

Based on the transcript and videotape of the August 5, 1997 hearing before the Board of Selectmen; the hostility of many residents to "bird watchers;" the roasting of Town Counsel and the Town Manager, who were attempting to work with state and federal authorities; the firing of John Crane, who was doing his best to comply with the federal and state guidelines; and the decision to rescind the Memorandum of Agreement, I conclude that the Selectmen will not authorize the Town Manager or NRO to take appropriate measures to protect the piping plover from "takes" as required by law. The long-standing intransigence of town officials persuades me that without an injunction, the town officials will not act to protect plovers when the pressure from ORV owners intensifies.

Accordingly, I adopt in large part the proposed preliminary relief recommended by the Service based on the Service guidelines and the affidavits of Dr. Melvin and Ms. Von Oettingen, each of whom point out that the Town of Plymouth stands apart from all private and municipally owned beaches in Massachusetts and other New England states in its failure to manage ORV use in accordance with the Service guidelines. (See Melvin ¶¶ 17, 53; Von Oettingen ¶ 16.)

Because the 1992 Plan ceases to be effective on September 25, 1998, I am hopeful that the Town will work with appropriate state and federal officials to reach an acceptable beach management plan which will make the attached court order no longer necessary. Although I have adopted the Service's pro-

posed order verbatim in most respects, I have modified the government's proposed order in the following ways. First, I do not require the Town to report to a Service employee, but instead give it the authority to implement the order itself. If there are violations of the order, the Service may move for contempt sanctions. I expect that there will be adequate consultation so that this will not be necessary. Second, I did not adopt the government's requested definition of "essential" vehicles because it was unclear to me whether residents of Long Beach have other access to their homes. Third, I leave it up to the Town to regulate pets, kites, and fireworks, as there is no evidence that in the past these activities have caused any "takes" or were improperly managed. Fourth, I did leave in the requirement of monitoring by a biologist, but do not expect the Town to hire someone new for this position if a current employee already has adequate training and expertise to do the job; the Town may make another proposal if a biologist is unnecessary. Finally, although there are mandatory buffer zones, the Service suggested that there should be flexibility to permit ORV access where not inconsistent with the breeding, nesting, and feeding needs of the piping plovers. In consultation with state and/or federal officials, the Town may take reasonable measures consistent with the needs of the piping plovers so long as any deviations from the order are reported to the Service and logged. The order requires the Town and the Service to provide full written reports at the end of the summer to ensure compliance.

The order expires in one year unless the Service demonstrates good cause to continue it based on the actions of the Town.

### ORDER

I **ALLOW** the motion for a preliminary injunction. *See* Attachment A.

### ATTACHMENT A

### ORDER FOR PRELIMINARY INJUNCTIVE RELIEF

Upon consideration of the motion of the United States of America for a Preliminary Injunction, the opposition of the defendant, and the affidavits and declarations submitted therewith, and after a hearing, the Court hereby orders that the defendant Town of Plymouth, and its officers and officials (collectively the "Town"), are hereby preliminarily enjoined as follows.

Beginning May 19, 1998, and continuing through August 31, 1998, and except for emergency vehicles, the Town shall prohibit off-road vehicles ("ORVs") from traveling onto Zones 3 and 4 of Plymouth Long Beach, and Zone 2 of Plymouth Long Beach north of the "crossover," unless the Town implements the following measures to protect threatened piping plovers, such measures to be in effect through August 31, 1998:

1. The Town shall continue to protect the piping plover nesting habitat areas that have been delineated on Plymouth Long Beach with signs and symbolic fencing. As piping plover nests are established, the Town shall expand the buffer zones to the extent necessary to ensure a protective radius of at least 50 meters around each nest, and shall expand the buffer zones further if the 50 meter radius appears inadequate to protect incubating piping plovers from harm or disturbance. If the nest is located less than 50 meters above the high tide line, a smaller buffer may be maintained, provided that monitoring by the Town's Natural Resource Officer (or other qualified monitor) indicates that birds are not showing signs of disturbance by passersby. The vehicle corridors delineated by state and federal officials on March 25, 1998 are permissible as long as nesting birds are not observed to be disturbed by passing or parking vehicles.

2. The Town shall conduct monitoring of piping plovers and their nests by a qualified biologist. Monitoring of piping plovers on the beach shall be conducted not less than three times per week, effective immediately. Monitoring shall be conducted daily whenever it is likely that more than 25 vehicles will be on the beach over the course of a 24–hour day. The monitor shall document locations of territorial or courting plovers, nest locations, and observations of any reactions of incubating birds to pedestrian or vehicular disturbances.

3. The Town shall close areas of Plymouth Long Beach to ORVs when flightless (unfledged) piping plover chicks are present, in accordance with the following protocol. When piping plover nests are found before the last egg is laid, ORVs shall be prohibited beginning the 26th day after the last egg is laid. This assumes an average incubation period of 27 days, and provides an approximate 1 day margin of error. When plover nests are found after the last egg has been laid, making it impossible to predict the hatch date, then the Town may set a firm date of May 15, the earliest possible hatch date, to implement the restrictions. Otherwise, each such nest shall be monitored at least twice per day, at dawn and dusk (before 0600 hours and after 1900 hours), and the appropriate area of the beach shall be closed to ORV use immediately when hatching begins. With continued twice-daily monitoring, the vehicle-free area shall extend 200 meters on each side of a line drawn through the nest site and perpendicular to the long axis of the beach. The resulting 400 meter-wide area of protected habitat shall extend from the ocean-side low water line to the bay-side low water line. After the brood is one week old, this buffer may be reduced to 100 meters on each side of the nest side, depending on brood mobility.

4. If ruts are present that are deep and extensive enough to restrict movements of plover chicks, then restrictions on vehicles shall begin at least 5 days prior to the anticipated hatching date of plover nests. If a plover nest is found with a complete clutch, precluding estimation of hatching date, and ruts have been created that could reasonably be expected to impede chick movements, then restrictions on vehicles should begin immediately.

5. Essential vehicles shall include law enforcement, official monitoring, and emergency rescue vehicles. Essential vehicles shall travel on sections on the beach where unfledged plover chicks are present only if such travel is absolutely necessary and no other reasonable travel route is available. All feasible steps shall be taken to minimize the number of trips by essential vehicles through chick habitat areas. Except in the case of an emergency involving a threat to human life or safety, the following procedures shall be followed to minimize the probability that chicks will be crushed by essential (non-emergency) vehicles:

a. Essential vehicles should travel through chick habitat areas only during daylight hours, and should be guided by a qualified monitor who has first determined the location of all unfledged plover chicks.

b. The speed of vehicles shall not exceed five miles per hour.

c. Foot travel is preferred. Use of open 4-wheel motorized all-terrain vehicles (ATVs) or non-motorized all-terrain bicycles is recommended whenever possible for monitoring and law enforcement because of the improved visibility afforded operators.

d. A log shall be maintained by the Natural Resources Officer of the date, time, vehicle number and operator, and purpose of each trip through areas where unfledged chicks are present. Personnel monitoring plovers should maintain and regularly update a log of the numbers and locations of unfledged plover chicks on each beach. Drivers of essential vehicles shall review the log each day to determine the most recent number and location of unfledged chicks.

e. Essential vehicles shall avoid driving on the wrack line, and travel shall be infrequent enough to avoid creating deep ruts that could impede chick movements. If essential vehicles are creating ruts that could impede chick movements, use of essential vehicles shall be further reduced, and, if necessary, restricted to emergency vehicles only.

6. Until August 31, 1998, or until all piping plover chicks have fledged (i.e., are able to fly), whichever is later, the Town shall, on a bi-weekly basis, provide to the U.S. Fish and Wildlife Service documentation and field notes reflecting the Town's implementation of monitoring activities; the location of each nest; the date when the nest was found and

the number of eggs present; the predicted hatch date; the actual hatch date for each brood and its location each day between hatching and fledging; and the boundaries of closed areas for each day when unfledged chicks are on the beach.

7. On September 30, 1998, the Service and the Town shall report on the compliance of the defendant with this Order. At any time either party may move for modification of the Order for good cause.

8. This Order shall expire on May 31, 1999 or on such other date as ordered by this Court.

**SO ORDERED.**